# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00813-CV

**Appellants, Dr. Phillip Osborne and Deborah Osborne //
Cross-Appellant, State Farm Lloyds**

**v.**

**Appellee, Jauregui, Inc. // Cross-Appellees, Dr. Phillip Osborne and Deborah Osborne**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
### NO. 99-08727, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## O P I N I O N

This appeal arises from a dispute between appellants and cross-appellees Dr. Phillip Osborne and Deborah Osborne and appellee Jauregui, Inc. Jauregui was the architect and builder of the Osbornes' house, which turned out to contain numerous defects that eventually led to mold contamination, among other problems. State Farm provided the Osbornes' homeowners' insurance. After mold was discovered in the house, the Osbornes brought suit against Jauregui and various subcontractors, seeking damages in excess of $2,000,000. State Farm intervened, asserting a subrogation claim for the amount it paid the Osbornes under their homeowners' policy. All parties other than Jauregui settled prior to trial for a total settlement amount of $1,260,500. After the jury returned a verdict finding that the Osbornes had suffered approximately $835,000 in damages, the trial court applied a settlement credit in Jauregui's favor and entered judgment that the Osbornes should take nothing on their claims. The trial court declined to award the Osbornes attorney's fees

and further declined to grant State Farm any of the proceeds from the Osbornes' settlement with the subcontractors under its subrogation claim. The Osbornes and State Farm both appealed. We reverse the denial of the Osbornes' request for attorney's fees and the denial of State Farm's subrogation claim. We remand to the trial court for a calculation of attorney's fees and a reconsideration of State Farm's claim for subrogation rights against the settlement proceeds.

## BACKGROUND

In 1997, the Osbornes bought a house from Jauregui for slightly more than $1 million. Shortly after moving in, the Osbornes noticed flaws in the construction. They later learned that the house had serious mold problems due to various construction errors. The Osbornes also noticed that because the house was built along a golf course, golf balls frequently hit and damaged the house, although Jauregui and its realtor had assured them there would be no "golf ball problem."[1] Prior to filing suit, the Osbornes provided Jauregui with a demand letter, offering to settle for the amount of $866,000, but Jauregui refused, responding with a counter-offer of $12,810.[2] In July 1998, the Osbornes sued Jauregui and its owner, Jose Luis Jauregui, asserting causes of action under the Texas

---

[1] Any reduction in the house's market value due to the "golf ball problem" is one example of a loss suffered by the Osbornes that would generally not be covered by a homeowners' insurance policy.

[2] A pre-suit demand letter is required in order to pursue a claim under the Texas Deceptive Trade Practices Act. Tex. Bus. & Com. Code Ann. § 17.505(a) (West 2002). This statutory notice requirement is designed to afford parties the opportunity to negotiate and settle prior to suit, potentially avoiding lengthy and costly litigation. *Star Houston Inc. v. Kundak*, 843 S.W.2d 294, 297 (Tex. App.—Houston [14th Dist.] 1992, no writ). If a defendant tenders an offer during settlement negotiations that is refused by the plaintiff, and the amount tendered turns out to be equal to or greater than the damages found at trial, the plaintiff's attorney's fee award is limited to the amount of fees incurred at the time the rejected settlement offer was made. Tex. Bus. & Com. Code Ann. § 17.5052(h) (West 2002).

2

Deceptive Trade Practices Act (DTPA) and for breach of contract, negligence, breach of warranty, real-estate fraud, and negligent misrepresentation. The Osbornes also sued a number of subcontractors and suppliers of construction materials, alleging negligence, breach of warranty, DTPA violations, and products liability.[3] In March 2003, State Farm intervened as the Osbornes' subrogee. Shortly before trial, the Osbornes settled with all the defendants except Jauregui and its owner. The settling defendants paid a total of $1,260,500—$1,120,500 of which remains after the payment of expert-witness fees. The Osbornes, who put on evidence at trial that they suffered a minimum of $2,418,153 in damages, excluding damages for mental anguish, bodily injury, and attorney's fees, went to trial to pursue its claims against Jauregui and its owner, the remaining defendants.

The jury found that Jauregui was negligent and breached warranties made to the Osbornes. The jury found that the Osbornes suffered damages totaling $835,158.78: $250,000 for repairs necessary to bring the house to the condition reasonably expected when they bought it; $220,000 for lost or damaged clothing and non-furniture personal effects; $70,000 for non-clothing items that were condemned due to mold contamination; $28,000 for repairs actually made by the Osbornes; $1,000 for damaged furniture; $95,158.78 for alternate living expenses; and $171,000 for moving, storage, and cleaning of their belongings.[4] The jury found that Jauregui was responsible for

---

[3] The Osbornes also sued Jauregui's realtor, but those claims are not before us on appeal.

[4] No questions were submitted to the jury regarding the measure of damages for items such as permanent reduction in market value of the home or the loss of time spent by the Osbornes in attempting to correct problems with the house. *See Ludt v. McCollum*, 762 S.W.2d 575, 576 (Tex. 1988) (holding that permanent reduction in market value after repair is recoverable in DTPA claim); *Village Mobile Homes, Inc. v. Porter*, 716 S.W.2d 543, 549-50 (Tex. App.—Austin 1986, writ ref'd n.r.e.) (holding that damages for lost time may be recoverable in DTPA claim).

3

48% of the Osbornes' damages and that the subcontractors and suppliers were responsible for the remaining 52%. The jury determined that Jauregui did not engage in unconscionable conduct, deceptive practices, fraud, or negligent misrepresentation. The jury did not find Jauregui's individual owner responsible for any of the Osbornes' damages.

Jauregui elected a dollar-for-dollar credit of the settlement funds against the damages awarded by the jury, and after applying that credit to the jury award, the trial court entered a judgment that the Osbornes should take nothing against Jauregui and refused to award attorney's fees against Jauregui. The trial court also denied State Farm's claim that it was entitled to any settlement funds through subrogation. The court made findings of fact and conclusions of law in which it found that there was evidence that the Osbornes had incurred $1,149,641.30 in attorney's fees,[5] but concluded that they were not entitled to attorney's fees because they did not obtain a net recovery from Jauregui and because they did not segregate the fees among the various claims and parties. Finally, the court found that because State Farm did not pay for any of the Osbornes' attorney's fees, the fees were "an uncompensated expense of collection," and that State Farm did not meet its burden to present evidence showing what portions of the settlement credits were "allocated to the items State Farm paid for . . . as opposed to other items of damage and expenses of collection alleged by [the Osbornes] in their petitions that State Farm had not paid for, such as mental anguish, bodily injury, repairs and attorney's fees." The court concluded that State Farm was not entitled to the settlement proceeds because it had not shown that the proceeds were payments for losses it had covered.

---

[5] The Osbornes have since received $17,606.01 from one of the defendants and state that if they prevail, the fees should be reduced to $1,132,035.29. They also seek $50,000 in appellate fees.

4

On appeal, the Osbornes argue that they were "prevailing parties" under the DTPA and were not required to segregate their attorney's fees. In its cross-appeal against the Osbornes, State Farm argues that the trial court abused its discretion in denying State Farm's subrogation claim because that denial grants the Osbornes a double recovery. State Farm also argues that any money received from Jauregui would be subject to State Farm's subrogation rights and that the trial court properly denied the Osbornes' request for attorney's fees.

## STANDARD OF REVIEW

The availability of attorney's fees under a particular statute is a question of law to be reviewed de novo. *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999); *see Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989) ("Matters of statutory construction are questions of law for the court to decide."). The extent to which attorney's fees can or cannot be segregated is a mixed question of law and fact. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). Where segregation of fees is possible, remand is required. *Id*. at 314.

In the absence of an unambiguous contractual provision regarding subrogation, the right to subrogation is grounded in equitable principles, and "[a] trial court's balancing of the equities should not be disturbed on appeal unless a showing is made that it would be inequitable to allow the judgment to stand." *Esparza v. Scott & White Health Plan*, 909 S.W.2d 548, 552 (Tex. App.—Austin 1995, writ denied).

## DISCUSSION

### Attorney's Fees

The trial court determined that the Osbornes were not eligible to recover attorney's fees because they were not "prevailing parties" under the DTPA. The trial court also found that the

5

Osbornes could not recover attorney's fees because they had not segregated their attorney's fees among the various claims and defendants. The Osbornes argue on appeal that they should recover attorney's fees as prevailing parties under the DTPA and that they were not required to segregate their attorney's fees because the fees were based on inextricably intertwined claims derived from the same set of facts.

Under the DTPA, a "consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees." Tex. Bus. & Com. Code Ann. § 17.50(d) (West Supp. 2006). The Texas Supreme Court has held that a plaintiff "who is awarded actual damages under the DTPA should also be awarded attorney's fees, even though the damage award is entirely offset by an opposing claim." *McKinley v. Drozd*, 685 S.W.2d 7, 10 (Tex. 1985). While *McKinley* involved a DTPA claim offset by a counterclaim rather than settlements from other defendants, the court emphasized the "legislative mandate to liberally construe the [DTPA] to protect consumers from deceptive practices, and the legislative intent to provide consumers with an efficient and economical means to seek redress for those deceptive practices." *Id*. at 9.

The Texas Supreme Court has not ruled on whether the reasoning in *McKinley* would apply in a situation where the damages owed by one defendant, such as Jauregui in the present case, were entirely offset by settlement amounts from other defendants. The appellate courts have been split in determining whether a plaintiff "prevails" under the DTPA where settlement amounts from other defendants exceed the judgment. Jauregui relies primarily on *Hamra v. Gulden*, 898 S.W.2d 16, 19 (Tex. App.—Dallas 1995, writ dism'd w.o.j.), which held that a plaintiff who sued two defendants jointly and severally did not prevail on a DTPA claim where the settlement credit from one defendant exceeded the damages found at trial, citing only *Blizzard v. Nationwide*

6

*Mutual Fire Insurance Co.*, 756 S.W.2d 801, 806 (Tex. App.—Dallas 1988, no writ), to support this holding.

The payments made to the plaintiff prior to trial in *Blizzard*, however, constituted insurance payments from her insurer. *Id*. at 806-07. The plaintiff sued her insurance company, but the amount of damages found by the jury at trial did not exceed the total amount of insurance payments paid to the plaintiff by the defendant prior to trial. These pretrial payments, made by the defendant subject to the judgment rather than a settling party, resemble the insurance benefits paid prior to trial by the defendant in *Allstate Insurance Co. v. Bonner*, 51 S.W.3d 289, 292 (Tex. 2001), where the plaintiff could not recover attorney's fees under the insurance code because the judgment amount owed by a defendant insurance company was entirely offset by benefits previously paid by that defendant. In cases where the amount of damages found by the jury at trial is lower than payments previously paid to the plaintiff *by the defendant* to compensate for such damages, it is reasonable to view the plaintiff as not having prevailed on a claim.

In the present case, however, the jury did not find that Jauregui owed less in damages than some amount that Jauregui had already paid to the Osbornes. Instead, the jury found Jauregui responsible and assessed damages in the amount of $835,000, while Jauregui reaped the benefits of its refusal to settle by offsetting the entire judgment with settlement funds paid by other defendants.

We find the facts in the instant case to more closely resemble those in *Roberts v. Grande*, 868 S.W.2d 956, 962 (Tex. App—Houston [14th Dist.] 1994, no writ), in which the plaintiff was allowed an award of attorney's fees even though the judgment was entirely offset by settlement amounts. "[A]pplying an offset from a previous settlement should not deprive a consumer of its attorney's fees." *Id*.

The Osbornes made a settlement offer to Jauregui prior to trial in the amount of $866,000, which proved to be a reasonable demand in light of the subsequent jury award, at a time when the Osbornes' attorney's fees had only reached $22,000. Jauregui responded with a counter-offer of only $12,810, forcing the Osbornes to incur an additional $1,127,641.30 in attorney's fees.[6] The Osbornes should not be penalized for proceeding to trial when their good-faith attempt to negotiate a settlement prior to filing suit was refused.

The dissent maintains that the Osbornes should not be awarded attorney's fees because they were fairly compensated for their damages before trial and that they should not continue to "litigate a claim after being made whole." However, the dissent assumes that the Osbornes were fairly compensated for their damages, ignoring the fact that the Osbornes put on evidence at trial that they suffered at least $2,418,153 in damages, excluding damages for mental anguish, bodily injury, and attorney's fees. Before litigation began, State Farm's experts had estimated that the Osbornes' damages exceeded their homeowners' insurance policy limit of $1,874,687, which left an uninsured deficit of approximately $600,000, not including uncovered damages such as mental anguish, bodily injury, and attorney's fees. Meanwhile, shortly before trial, the Osbornes were able to negotiate settlement amounts with certain defendants, but only after incurring substantial attorney's fees. The settlement amounts totaled $1,260,500 and were placed in trust because of State Farm's subrogation claim. Thus, prior to trial it was unclear whether the Osbornes would actually receive any of the settlement funds due to State Farm's subrogation interest. In light of the damage estimates produced by both the Osbornes and State Farm, it was highly unlikely that the Osbornes could have predicted that a jury would find that they suffered only $835,158.78 in damages.

---

[6] It is not uncommon for an attorney's fee award to exceed the damages recovered. *Hoover Slovacek L.L.P. v. Walton*, 206 S.W.3d 557, 563 n.8 (Tex. 2006).

8

While it is true that the Osbornes had received $1,874,687 from State Farm in insurance payments prior to trial and even assuming that they would receive all of the $1,260,500 in settlement amounts for a total of $3,135,187, the Osbornes were also relying on evidence that they had suffered at least $2,418,153 in damages and incurred almost $1,149,641 in attorney's fees for a total of $3,567,794. Therefore, unless the Osbornes went to trial, they would still have had at least $432,607 in uncompensated damages. If the jury had agreed that the Osbornes suffered $2,418,153 in damages as a result of Jauregui's conduct, and the trial judge had awarded the Osbornes their full $1,149,641 in attorney's fees, the Osbornes would have recovered $2,307,294 at trial, taking into account the dollar-for-dollar settlement credit. Assuming the Osbornes would then have been "made whole," and assuming State Farm properly asserted its subrogation claim to $1,874,687, the Osbornes would have been left with the $432,607 they needed to be fully compensated. Faced with these circumstances prior to trial, it was not at all unreasonable for the Osbornes to continue to pursue their claims against Jauregui.

Awarding attorney's fees to the Osbornes before applying the settlement credit is consistent with the reasoning in *McKinley* and the purpose of the DTPA. The Texas legislature determined that the DTPA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Tex. Bus. & Com. Code Ann. § 17.44(a) (West 2002). Because we find that the Osbornes were prevailing parties under the DTPA, we conclude that the trial court erred by holding that the Osbornes were not entitled to attorney's fees because they did not prevail under the DTPA.

However, the trial court also held that the Osbornes were not entitled to attorney's fees because they failed to segregate the fees among the various claims and parties. The Osbornes contend that they are not required to segregate their attorney's fees by claim or defendant because the fees are related to inextricably intertwined claims that are based on a common set of facts.

Generally, a party seeking attorney's fees has a duty to segregate the fees incurred in pursuing claims or defendants for which fees are recoverable from those in which they are not, and a trial court may refuse to award attorney's fees in the absence of segregation. *West Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 267 (Tex. App.—Austin 2002, no pet.). However, there has historically been an exception to this rule when claims "are dependent upon the same set of facts or circumstances and thus are 'intertwined to the point of being inseparable.'" *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991) (quoting *Gill Sav. Ass'n v. Chair King, Inc.*, 783 S.W.2d 674, 680 (Tex. App.—Houston [14th Dist.] 1989), *modified*, 797 S.W.2d 31 (Tex. 1990)). The Osbornes argue that they are subject to this exception because the facts necessary to prove that the various subcontractors and suppliers performed defective work or supplied defective products are the same facts necessary to prove that Jauregui failed to construct the house in a good and workmanlike manner.

The Texas Supreme Court recently curtailed the *Stewart Title* exception, stating that intertwined facts do not make fees recoverable and that "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Chapa*, 212 S.W.3d at 313-14. However, the Osbornes' failure to segregate fees does not mandate a denial of all attorney's fees because "an unsegregated damages award requires a remand." *Id*. at 314.

10

We find that the Osbornes have a duty to segregate their attorney's fees into recoverable and nonrecoverable claims. While the claims against Jauregui and the various settling defendants may arise from the same set of facts, this exception no longer applies. We remand for purposes of determining the amount of attorney's fees incurred by the Osbornes on the DTPA claim against Jauregui in a manner consistent with *Chapa*. *See id*.

**Subrogation**

The trial court determined that State Farm did not have subrogation rights against the settlement proceeds because State Farm did not meet its burden to present evidence allocating the settlement amounts to losses covered by insurance payments. State Farm argues that its contractual right of subrogation displaces any equitable considerations regarding whether the Osbornes have been "made whole" for their damages. State Farm further argues that even under an equitable determination of subrogation rights, it is entitled to the settlement proceeds because the Osbornes have already been "made whole" by insurance payments totaling $1,874,687.28. State Farm contends that it is entitled to the settlement funds without being required to show which settlement amounts were allocated to damages covered by insurance payments.

The principle of subrogation provides that an insurer that has paid its insured for losses covered by an insurance policy is entitled to the insured's rights and remedies against a third party for the covered losses. *Harris v. American Prot. Ins. Co.*, 158 S.W.3d 614, 622 (Tex. App.—Fort Worth 2005, no pet.). Texas courts are "particularly hospitable" to the concept. *Id*. (quoting *Interfirst Bank Dallas, N.A. v. United States Fid. & Guar. Co.*, 774 S.W.2d 391, 397 (Tex. App.—Dallas 1989, writ denied)).

11

In the absence of a contractual subrogation provision, subrogation rights are "firmly granted in" and "not easily detached from" equity. *Esparza v. Scott & White Health Plan*, 909 S.W.2d 548, 552 (Tex. App.—Austin 1995, writ denied). If either an insured or an insurer "must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume." *Ortiz v. Great S. Fire & Cas. Ins. Co.*, 597 S.W.2d 342, 344 (Tex. 1980) (quoting *Garrity v. Rural Mut. Ins. Co.*, 253 N.W.2d 512, 514 (Wis. 1977)). An insurer is not entitled to an equitable right of subrogation until the insured is "made whole" for his loss. *Ortiz*, 597 S.W.2d at 343; *Esparza*, 909 S.W.2d at 552.

In determining equitable subrogation rights, "[t]o avoid injustice, the equities must still be balanced in deciding what amount, if any, the subrogee is entitled to receive in a given case . . . . A trial court is not cast adrift on the sea of equity without guidance, however. Various rules and considerations offer moorings for the trial court in applying equity." *Esparza*, 909 S.W.2d at 552. Such considerations include the prevention of a double recovery by the insured, the parties' conduct during settlement or before the court, and evidence of damages. *Id*. at 552-553.

In a determination of subrogation based purely on equitable factors, the trial court did not abuse its discretion in denying subrogation rights to State Farm. For example, State Farm, by arguing at trial and on appeal that the Osbornes are not entitled to attorney's fees under the DTPA, asserted a position that was adverse to the very parties whose interests State Farm, as an insurer, was expected to protect. The fact that State Farm attempts to compromise the Osbornes' efforts to achieve the fullest possible recovery suggests that equity should not favor State Farm in a determination of subrogation rights.

12

Furthermore, State Farm's statements at trial directly conflict with its argument on appeal that the Osbornes were "made whole" because the jury returned a judgment of $835,158.78 in damages, and the total insurance payments received by the Osbornes exceed this amount. For example, State Farm stated in its third amended petition in intervention that the Osbornes suffered damages at least in the amount of $1,902,247.44. A judicial admission is conclusive upon the party making it, relieves the opposing party's burden of proving the admitted facts, and bars the admitting party from disputing it. *Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980). State Farm also put on an expert, Buddy Henderson, to testify that $1,477,351 was a reasonable cost of repairs for the house and that he relied on this amount in determining that State Farm should pay the full policy limits to the Osbornes. A party's testimony at trial will be treated as a judicial admission if (1) the statement is deliberate, clear, and unequivocal, (2) the statement is contrary to an essential fact embraced in the theory of recovery asserted by the party giving the testimony, (3) the statement is not also destructive of the opposing party's theory of recovery, and (4) it would be unjust to permit a party to recover after he has sworn himself out of court by clear and unequivocal testimony. *Id*. Each of these factors is satisfied with reference to Henderson's expert testimony that the cost of repairs alone could reasonably be $1,477,351. However, State Farm now asserts that the Osbornes' damages are limited to the amount of the jury verdict. As a policy matter, allowing this drastic change in State Farm's damages assessment would mean that insured parties could not accept insurance payments from an insurer without fear that in the future, the insurer would claim that it had overpaid and that the excess should be used to offset settlement payments for mental anguish or other uncovered damages. These factors support the trial court's equitable decision to deny subrogation to State Farm. Based on longstanding Texas law regarding

13

equitable subrogation at the time the trial court's judgment was issued, the trial court did not abuse its discretion.

However, the Texas Supreme Court recently held in *Fortis Benefits v. Cantu*, No. 05-0791, 2007 Tex. LEXIS 603, at *18-19 (Tex. June 29, 2007), that contract-based subrogation rights trump equitable considerations, which are to be used by default in the absence of a contractual right to subrogation. As a result, equitable considerations such as the "made whole" doctrine are to apply "only in the absence of contrary reimbursement language in the contract." *Id*. at *18. The contract at issue in *Fortis* established a right of subrogation, stating, "Upon payment of benefits, *We will be subrogated to all rights of recovery a Covered Person may have against any person or organization*. . . . Such right extends to the proceeds of any settlement or judgment; but is limited to the amount of benefits We have paid." *Id*. at *5 n.11. The Texas Supreme Court noted that because the provision was "not imprecise or ambiguous" and it gave Fortis "an unfettered right to recover the proceeds from the settlement," equitable considerations must give way to the language of the contract. *Id*.

State Farm, in its petition for intervention, stated that "State Farm is equitably entitled to seek recovery for such damages against Defendants as a real-party-in-interest, and is authorized to pursue this claim in the name of its insured. [The Osbornes] have assigned their rights and interest to the extent of such benefits paid to them by State Farm." This language reflects both equitable and contractual subrogation principles. In addition, State Farm claims in its October 20, 2004 motion to modify, correct, or reform the judgment that the trial court's judgment

is in error "in that it denies State Farm Lloyds the right to apply settlement funds received from third parties in satisfaction of State Farm Lloyds [sic] contractual and equitable subrogation claim."[7]

The subrogation provision in the Osbornes' homeowners' insurance policy with State Farm reads in its entirety:

> **Subrogation.** An **insured** may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.
>
> If an assignment is sought, an **insured** must sign and deliver all related papers and cooperate with us.

This provision, which merely states that State Farm "may" require an assignment of rights, is significantly more ambiguous than the provision at issue in *Fortis*, which states that the insurer "*will* be subrogated to *all* rights of recovery," including "the proceeds of *any* settlement or judgment." *Fortis*, 2007 Tex. LEXIS 603, at *5 n.11 (original emphasis removed, emphases added).

Even if State Farm's contractual right to subrogation controls over equitable considerations, State Farm may be prevented from recovering settlement funds due to its failure to allocate the funds to covered versus uncovered losses. The subrogation provision in the Osbornes' policy states that an assignment of rights may be required "for a loss to the extent that payment is made by [State Farm]." In a claim for subrogation where settlement amounts are at issue, an insurer bears the burden of showing what amount, if any, of the settlement amounts correspond to amounts

---

[7] State Farm further states in its November 12, 2004 motion to modify, correct, or reform the amended final judgment that "because State Farm Lloyds has already paid $1,874,687.28 to the Plaintiffs, and the Plaintiffs' damages were only $835,158.78, State Farm Lloyds is both equitably and contractually entitled to subrogation."

paid by it. *Ortiz*, 597 S.W.2d at 344. Subrogation should not be awarded if it is not clear what portion of the settlement is intended to compensate for covered losses. *Id.* "In true subrogation cases, where the insurer is bringing the action against the third party, or is participating in the insured's action against the third party, recovery by the insurer is generally limited to the same elements as those for which it has made payment." Lee R. Russ & Thomas F. Segalla, 16 *Couch On Insurance* § 226-52 (3d ed. 2000). It is not clear from the record which types of losses were meant to be covered by the amounts that the Osbornes received from the settling parties. "[T]he mere fact that an insured receives a recovery from another source may not establish that the amounts recovered correspond to the same elements of loss for which the insured has already recovered from the insurer." *Id*.

State Farm failed to allocate the settlement funds to covered versus uncovered losses. We can assume that because State Farm asserts in its brief that it assisted "vigorously" in securing the settlements, there was ample opportunity to make such an allocation. There is no evidence that the remaining settlement amounts are allocable to covered damages, rather than uncovered damages such as mental anguish, attorney's fees, or any reduction in the house's market value due to the "golf ball problem."

Because the trial court's order denying subrogation rights to State Farm was issued prior to *Fortis* and thus before specific contractual subrogation rights were deemed controlling over equitable principles, the trial court did not have an opportunity to evaluate and interpret the subrogation clause in the Osbornes' homeowners' policy. Therefore, we remand to the trial court for a review of the subrogation provision in order to determine whether the language is sufficiently precise and unambiguous to control over equitable subrogation principles and to evaluate the effect

16

of State Farm's failure to allocate the settlement funds, in light of the Texas Supreme Court's holding in *Fortis*.

In the event that *Fortis* is applicable to the Osbornes' homeowners' policy, the contractual subrogation provision must control over equitable considerations. In the alternative, if the trial court finds that *Fortis* does not apply to the present case because the contractual subrogation provision is not sufficiently precise and unambiguous, the determination of State Farm's subrogation rights must be based on the "trial court's balancing of the equities." *Esparza*, 909 S.W.2d at 552.

Based on an evaluation of equitable factors, the trial court did not abuse its discretion in denying subrogation rights to State Farm. However, we find it significant that at the time such rights were denied, the Osbornes were also denied their attorney's fees. We have since determined that the Osbornes should be awarded attorney's fees. As a result, the factors that may be taken into account by the trial court in balancing the equities to determine subrogation rights have changed. Where the facts have changed, the trial court's equitable determination may change as well because "[e]quity is inextricably tied to facts" and "the conflict of interests in subrogation . . . cannot be resolved by a bright-line test that curtails a trial court's discretion to apply equity based on the facts of the case." *Id.* at 553. In light of the fact that this case has been remanded to the trial court for purposes of segregating the Osbornes' attorney's fees and to allow for a review of the contractual subrogation provision and the applicability of *Fortis*, the trial court, if it finds *Fortis* to be inapplicable, may also wish to revisit its equitable determination of State Farm's subrogation rights.

We reverse the trial court's denial of State Farm's subrogation claim and remand to the trial court for purposes of reviewing the contractual subrogation provision in light of *Fortis* and,

17

if necessary, revisiting its equitable determination of State Farm's subrogation rights as a result of our award of attorney's fees to the Osbornes and remand for the purpose of calculating the fee award.

## CONCLUSION

Because the Osbornes were prevailing parties under the DTPA, they are entitled to reasonable and necessary attorney's fees from Jauregui. We reverse the trial court's denial of the Osbornes' attorney's fees. Because we find that the Osbornes were required to segregate their attorney's fees, we remand for the purposes of segregation.

Because the Texas Supreme Court's recent decision in *Fortis Benefits v. Cantu* requires that precise and unambiguous contractual language regarding subrogation controls over equitable considerations, we reverse the trial court's denial of State Farm's subrogation claim and remand for a determination of State Farm's subrogation rights in light of the contractual subrogation provision in the Osbornes' homeowners' policy and, if *Fortis* is deemed inapplicable, a determination of State Farm's equitable subrogation rights after any award of attorney's fees to the Osbornes.

_____

Diane Henson, Justice

Before Justices Patterson, Puryear and Henson;
   Dissenting Opinion by Justice Puryear

Reversed and Remanded

Filed:   August 29, 2007

18